**SCOTTSDALE INSURANCE COMPANY, Plaintiff,**

v.

**CARRABASSETT TRADING COMPANY, LTD., and Raul Torres, Defendants.**

**Civil Action No. 04–12659–FDS.**

United States District Court, D. Massachusetts.

Oct. 31, 2006.

Steven P. Perlmutter, Robinson & Cole LLP, Boston, MA, for Scottsdale Insurance Company.

Ross A. Annenberg, George Ellis, Jr., Ellis Law Offices, Worcester, MA, for Raul Torres.

Walter M. Lupan, Michael J. Murphy, Grassia, Murphy, & Lupan, PA, for Carrabassett Trading Company, Ltd.

## MEMORANDUM AND ORDER ON PLAINTIFF SCOTTSDALE INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT

SAYLOR, District Judge.

This is a dispute over the scope of an insurance policy. Plaintiff Scottsdale Insurance Company (the insurer) seeks a declaratory judgment stating that it has no duty to defend defendant Carrabassett Trading Company, Ltd. (the insured) in a lawsuit brought by co-defendant Raul Torres, who was severely injured while working at Carrabassett. Jurisdiction is based on diversity of citizenship.

In essence, the dispute concerns whether Torres was a "leased worker" (and therefore not covered by the policy) or a "temporary worker" (and therefore covered). Scottsdale has moved for summary judgment on the ground that, according to the definitions in the policy, Torres was a "leased worker" when he was injured and that his claim is therefore not covered. For the reasons stated below, the motion will be granted.

### I. Factual Background

The facts are set forth in the light most favorable to the defendants.

### A. Carrabassett's Relationship with Venturi Staffing Partners, Inc.

Carrabassett is a small fiber-blending and recycling company. Because the demand for its product is inconsistent, Carrabassett's workload and need for help is constantly changing. The company employs five permanent employees, two of whom are salaried and three of whom are paid hourly. However, when demand for its product is high, Carrabassett also relies upon an agency called Venturi Staffing Partners, Inc., to supplement its workforce.

The parties disagree about whether Venturi is a "leasing firm." However, it is undisputed that Venturi is in the business of placing its employees at client companies for varying lengths of time. Venturi employees may serve as short-term replacements for regular employees of the client company who are on leave, serve as seasonal employees for special projects, or otherwise supplement a client company's workforce shortage. They may also become full-time employees of the client company.

Carrabassett did not enter into a formal written contract with Venturi. Nonetheless, it appears that Venturi and Carrabassett had some form of agreement as to the placement of employees at the company. Venturi issued paychecks to the worker, withheld appropriate taxes from the worker's paycheck, and bore responsibility for any workers' compensation claims. In addition, Venturi retained the right to hire, place, terminate, and discipline the worker. Carrabassett had the authority to assign the worker daily tasks, bore responsibility for training and supervising the worker, and retained the right to ask the worker not to return to Carrabassett after unsatisfactory performance.

Venturi sent Carrabassett a weekly bill that included the employee's salary, taxes, the amount required for the workers' compensation policy premium, and a fee for its services. Venturi also provided Carrabassett with weekly time sheets, which stated that clients could not employ Venturi workers without written consent for six months after the workers completed their assignments; prohibited clients from having Venturi workers perform certain tasks without written consent; and contained an indemnification clause. In addition, the time sheet placed certain obligations on the workers and described the conditions under which they might qualify and apply for direct employment with Venturi clients.

## B. *Torres' Employment with Venturi and his Accident at Carrabassett*

Defendant Torres began working for a predecessor of Venturi in May 2001. After working for several other clients, Torres was placed at Carrabassett on August 20, 2003. He worked there continuously until December 8, 2003. After several weeks, Torres was again assigned to work at Carrabassett beginning on January 19, 2004, and (with the exception of one week in June) worked there continuously until August 23, 2004.

On both occasions that Venturi placed Torres at Carrabassett, the placement was for an indefinite period of time. During the course of his two assignments at Carrabassett, Torres worked a total of 1613.5 hours. Although Venturi placed five other workers at Carrabassett while Torres was working there, the others worked substantially fewer hours than Torres, recording only 32, 117, 30, 10, and 280 hours during the fourteen months prior to Torres's accident.

On August 23, 2004, Torres's left arm was severed near the elbow by a woolpicking machine. He has since filed a negligence lawsuit against Carrabassett in the Worcester Superior Court, which is the case underlying this insurance coverage dispute.

## C. *The Comprehensive General Liability Insurance Policy Provided by Scottsdale*

On August 23, 2004 (coincidentally, the same day as Torres's accident), Carrabassett obtained a comprehensive general liability ("CGL") insurance policy from Scottsdale. The policy includes a bodily injury provision that is subject to an "Employer's Liability" exclusion. Among other things, the exclusion states that the insurance policy does not cover bodily injuries

sustained by an "employee" arising out of the course of his or her employment.

The policy defines the following relevant terms:

5. "Employee" includes a "leased worker." "Employee" does not include a "temporary worker."

&ast; &ast; &ast; &ast; &ast; &ast;

10. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker."

&ast; &ast; &ast; &ast; &ast; &ast;

19. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

Scottsdale contends that Torres meets the definition of a "leased worker" and that therefore the policy does not cover his claim. However, Carrabassett contends that Torres was only a "temporary worker" and that the exclusion is therefore inapplicable.

## II. *Analysis*

### A. *Standard for Summary Judgment*

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.,* 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1st Cir.1990)). The burden is upon the moving party to show, based upon the pleadings, discovery, and affidavits, "that there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court must view the entire record in the light most hospitable to the non-moving party and indulge $_{all}$ reasonable inferences in that party's favor. *O'Connor v. Steeves,* 994 F.2d 905, 907 (1st Cir.1993). Here, no genuine issue as to any material fact exists, making summary judgment appropriate.

### B. *Whether Scottsdale Has a Duty to Defend the Torres Lawsuit*

#### 1. *General Principles of Construction*

 In Massachusetts, the interpretation of an insurance contracts is generally a matter of law. *Essex Ins. Co., v. Carroll Adver. Co., Inc.,* 268 F.Supp.2d 75, 79 (D.Mass.2003).[1] The court begins by reading the insurance contract according to its plain language. It must "construe the words of the policy according to the fair meaning of the language used, as applied to the subject matter." *Id.* at 79, *quoting, Jacobs v. United States Fid. & Guar. Co.,* 417 Mass. 75, 627 N.E.2d 463 (1994). In so doing, the court must "consider what an objectively reasonable insured, reading the relevant policy language, would expect to be covered." *Brazas Sporting Arms, Inc. v. American Empire Surplus Lines Ins. Co.,* 220 F.3d 1, 4 (1st Cir.2000) (internal quotation omitted).

 A liability insurer owes a broad duty to defend its insured against any claims that create a potential for indemnity. *Doe v. Liberty Mut. Ins. Co.,* 423 Mass. 366, 368–69, 667 N.E.2d 1149 (1996).

---

1. The parties agree that Massachusetts law governs the dispute.

Therefore, Scottsdale is required to defend Carrabassett if the allegations in the underlying Torres suit are reasonably susceptible to an interpretation that they state a claim covered by the policy. *See Brazas,* 220 F.3d at 4.

■ However, a liability insurer has no duty to defend a claim that is excluded from coverage. *Metropolitan Prop. & Cas. Ins. Co. v. Fitchburg Mut. Ins. Co.,* 58 Mass.App.Ct. 818, 820, 793 N.E.2d 1252 (2003). The liability insurer bears the burden of establishing that an exclusion applies. *Id.* An exclusion should be read narrowly and any ambiguities should be strictly construed against the insurer. *Brazas Sporting Arms,* 220 F.3d at 4–5; *Hakim v. Massachusetts Insurers' Insolvency Fund,* 424 Mass. 275, 281–282, 675 N.E.2d 1161 (1997). Ambiguity exists when the language contained in an insurance contract is susceptible to more than one meaning. *Lumbermens Mut. Cas. Co. v. Offices Unlimited, Inc.,* 419 Mass. 462, 466, 645 N.E.2d 1165 (1995). However, an ambiguity is not created simply because the parties prefer contrary interpretations of the contract language. *Id.* at 466, 645 N.E.2d 1165.

## 2. *Whether the Employee Exclusion Applies*

■ As a general matter, CGL policies are "intended to protect an insured employer against liability for losses to third parties arising out of the operation of the insured's business." *Monticello Ins. Co. v. Dion,* 65 Mass.App.Ct. 46, 47, 836 N.E.2d 1112 (2005). Employees are usually excluded from coverage under CGL policies because the employer is expected to have separate workers' compensation insurance, as required by Mass. Gen. Laws ch. 152, § 25A. *Id.* Because leasing agencies also are required to have workers' compensation insurance for their employees, "leased workers" are usually considered "employ-ees" for purposes of the CGL employee exclusions as well. *Id.* at 49–50, 836 N.E.2d 1112; *see Home Ins. Co. v. Liberty Mutual Fire Ins. Co.,* 444 Mass. 599, 604–05, 830 N.E.2d 186 (2005).

■ Consistent with typical practice, the exclusion in the policy at issue here states, among other things, that the policy does not cover bodily injury to "an 'employee' of the insured arising out of and in the course of ... or [p]erforming duties related to the conduct of the insured's business...." The parties appear to agree that Torres's injuries arose while he was performing duties related to the conduct of Carrabassett's business. However, they disagree as to whether Torres was a Carrabassett "employee" at the time of the accident.

Under the policy, the definition of an "employee" includes a "leased worker," but not a "temporary worker." The definition of a "leased worker" has two sentences. Under the first sentence, a "leased worker" is a "person leased by a labor leasing firm under an agreement between you [Carrabassett] and the leasing firm to perform duties related to the conduct of your business." Under the second sentence, however, a "leased worker does not include a temporary worker." The term "temporary worker" is defined to include, among other things, a person "furnished" to Carrabassett "to meet short-term workload conditions." Thus, Torres could qualify as a "leased worker" under the first sentence, but nonetheless be excluded under the second sentence if he was a "temporary worker." The Court will consider each sentence in turn.

### a. *Whether Torres Was "Person Leased by a Labor Leasing Firm"*

As noted, under the first sentence of the definition of "leased worker," a "leased worker" is a "person leased by a labor

leasing firm under an agreement between you [Carrabassett] and the leasing firm to perform duties related to the conduct of your business." The parties appear to agree that Torres was sent to Carrabassett to perform duties related to the conduct of its business. Defendant disputes, however, whether Venturi is a "labor leasing firm."

First, defendant argues that Venturi is not a "labor leasing firm" because it did not enter into a written lease agreement with Carrabassett. However, the plain language of the "leased worker" definition only requires that the worker be leased "under an agreement." There is no requirement under the policy that the agreement be memorialized in writing or labeled as a "leasing agreement."

Second, defendant argues that Venturi never used the term "lease" in the course of its business. Among other things, a "lease" is "a contract by which the rightful possessor of personal property conveys the right to use that property in exchange for consideration." Bryan A. Garner, Black's Law Dictionary 907 (8th ed.2004). Applying this definition in the employment context, a company "leases" a worker to a client when it gives the client the right to use the worker's services for a period of time in exchange for a fee. Venturi's business clearly fits that description, even if it does not use the actual word "lease" to describe its contractual arrangements.[2]

In short, Torres was "leased by a labor leasing firm under an agreement" between Carrabassett and Venturi "to perform duties related to the conduct of [Carrabassett's] business." He is therefore a "leased worker" under the within the meaning of the first sentence of the exclusion.

### b. Whether Torres was a "Temporary Worker"

The Court turns next to the second sentence of the definition of "leased worker," which provides that a "leased worker" does not include a "temporary worker."

In order to fall within the definition of a "temporary worker" under the policy, Torres must have been "furnished to" Carrabassett under one of three circumstances: (1) to substitute for a permanent employee on leave, (2) to meet seasonal workload conditions, or (3) to meet short-term workload conditions. The parties agree that Torres was not substituting for a permanent employee on leave at Carrabassett,

---

2. The conclusion that Venturi is a "labor leasing firm" is buttressed by the terms of the Massachusetts' Workers' Compensation Act. *See American Family Mut. Ins. Co. v. Tickle,* 99 S.W.3d 25 (Mo.Ct.App.2003) ("In Missouri, the courts consistently turn to the Workmen's Compensation Act in determining the meaning of the word 'employee' as used in exclusion clauses of liability insurance policies."). The MWCA defines a "leasing company" as follows:

 a business entity whose business consists largely of leasing employees to one or more client companies under contractual arrangements that retain for such employee leasing companies a substantial portion of personnel management functions, such as payroll, direction and control of workers, and the right to hire and fire workers provided by the employee leasing company; provided, however, that the leasing arrangement is long term and not an arrangement to provide the client company temporary help services during seasonal or unusual conditions.

 Mass. Gen. Laws ch. 152, § 14A(1)(c). *See also Home Ins. Co.,* 444 Mass. at 602, 830 N.E.2d 186 (describing an employee leasing agreement in which the leasing company retained the rights and obligations of the employer while the client company directed the worker's day-to-day activities; the leasing company "chose whether to continue [the worker's] employment, determined his rate of pay, provided his benefits, paid for his workers' compensation insurance, and was responsible completely for payroll, payroll tax, insurance, and other administrative matters.").

and therefore does not fall within the first category under the definition. The question is thus whether Torres was furnished to meet either "seasonal" or "short-term" workload conditions.

A threshold question is whether the terms "seasonal" and "short-term" are to be measured at the time the agreement is made or at some point thereafter. For example, a worker might be supplied to meet an anticipated one-week shortage (and therefore be "short-term," as measured by the parties' expectations), but wind up working for three years (and therefore be "long-term," as measured by hindsight). The answer appears to lie in the words "furnished ... to meet" in the "temporary worker" definition. The phrase "furnished ... to meet" suggests that the reasonable expectations of the parties concerning workload conditions, as measured at the time the employee is "furnished," governs whether the employee fits within either the "seasonal" or "short-term" category. Thus, even if the duration of a worker's assignment ends up being lengthy, he or she will still be considered a "temporary worker" if the parties reasonably intended for him or her to fulfill a short-term workload condition. Likewise, a worker will not be considered "temporary" if the parties reasonably intended for him or her to help with a long-term or permanent workload condition, even if the assignment is cut short.[3]

### (1) "Seasonal" Workload Conditions

As noted, the second category under the definition of "temporary worker" is an employee furnished to meet a "seasonal" workload condition. There is no evidence in the record suggesting that Torres was hired for that purpose. Although Carrabassett asserts that demand for its product regularly changes, there is no evidence that recycling is an entirely "seasonal" business, like farming or snow removal, or subject to substantial seasonal increases, such as the increase in retail sales prior to the Christmas holiday.[4] Furthermore, Torres's hours at Carrabassett remained relatively stable over the course of the year, strongly suggesting that his workload was not "seasonal."[5]

### (2) "Short–Term" Workload Conditions

Thus, the only way that Torres can be considered a "temporary worker" is if he falls within the third category: if he was

---

**3.** This has a further practical advantage. If the determination is to be made retrospectively, the parties have no way of knowing when a worker has crossed the line and is no longer working to meet "short-term" conditions (and thus no longer a "temporary worker"), and thus no way of knowing when insurance responsibility shifts.

In any event, even if the Court were to take a retrospective approach, it is highly doubtful that Torres could be considered a "temporary worker." Torres worked at Carrabassett for 47 weeks and 1613.5 hours over the course of one year. There is no evidence in the record suggesting that Torres would have left Carrabassett had he not been injured, so his work there conceivably could have extended well beyond 47 weeks. A condition that required Torres to work nearly the same hours as several full-time Carrabassett employees for such an extended period clearly is not "short-term."

**4.** Work done every year in anticipation of major holidays is generally considered "seasonal." *See, e.g., Nautilus Insurance Co. v. Gardner*, 2005 WL 664358, *6 (E.D.Pa.2005) (concluding that employment that takes place for 14 days before Halloween at a "haunted house" can reasonably be considered seasonal).

**5.** Torres worked at Carrabasset for a total of 1613.5 hours. Other than the week he was injured, he worked between 20 and 45 hours each week for 47 weeks. He spent 17 weeks working 40 or more hours, 22 weeks working between 30 and 39 hours, and 7 weeks working between 20 and 29 hours.

furnished to Carrabassett "to meet ... short-term workload conditions." The phrase "short-term" is not defined in the policy. However, the mere fact that a term in an insurance policy is undefined does not create an inherent ambiguity.[6] Instead, the undefined term should be read according to its plain and ordinary meaning. *Prudential Prop. & Cas. Ins. Co. v. LaMarr*, 92 Ohio App.3d 331, 635 N.E.2d 63, 65 (1993); *see also Jacobs v. United States Fid. & Guar. Co.*, 417 Mass. 75, 627 N.E.2d 463 (1994).

The plain meaning of the word "short-term" suggests a period of time that is relatively brief and relatively finite. For example, someone hired to complete a specific project or responding to an unexpected, temporary demand in goods or services could reasonably be said to have been furnished to meet "short-term" workload conditions. Conversely, "short-term" cannot mean "indefinite" or "open-ended."[7] A reasonable person considering policy language covering injuries to workers provided to meet "short-term" workload conditions would not expect coverage for workers provided for "indefinite" workload conditions. *See Brazas*, 220 F.3d at 4.

The absence of a written contract dictating the length of Torres's two Carrabassett assignments complicates the task of determining the parties' expectations. Nonetheless, the record clearly indicates that the parties intended that Torres work at Carrabassett for an indefinite amount of time. Carrabassett's President, Peter Munro, testified that when Torres arrived at Carrabassett, he was expected to stay as long as the company needed him. *See* Munro Dep. at 34. Once there, that expectation did not change; according to David Del Dotto, a Venturi manager, Torres "was a worker who was on assignment for Carrabassett for an indefinite period of time based on the client's need." Del Dotto Dep. at 59. Furthermore, there is no evidence in the record suggesting that

---

**6.** As the California Supreme Court observed in *Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.*, 5 Cal.4th 854, 21 Cal. Rptr.2d 691, 855 P.2d 1263 (1993):

[A]ny rule that rigidly presumed ambiguity from the absence of a definition would be illogical and unworkable. To avoid the ambiguity perceived by the Court of Appeal, an insurer would have to define every word in its policy, the defining words would themselves then have to be defined, their defining words would have to be defined, and the process would continue to replicate itself until the result became so cumbersome as to create impenetrable ambiguity.

**7.** Statutes and reported decisions regularly distinguish between "indefinite" and "short-term" employment in a variety of contexts. For example, the immigration laws allow certain types of work visas to be issued in order to satisfy "short-term" workload conditions, but not conditions that will persist for an "indefinite" amount of time. *See, e.g.,* 8 CFR 214.2(h)(9) (noting that H–1 aliens must be working for a temporary period with the intention to return abroad; if the employer in-

tends to use the alien's services "indefinitely," a visa classification which allows the alien to immigrate under the numerical preference system should be used). The same distinction has also been made in the context of employment litigation; for example, one court has observed that "the hallmark of at-will employment is not that it is *short term*, but that it is for an *indefinite term.*" *Enowitz v. Sanwa Business Credit Corp.*, 902 F.Supp. 59 (S.D.N.Y.1995) (emphasis added). Finally, under the federal tax code, a taxpayer may deduct his living expenses when he accepts temporary, but not indefinite, employment away from home. 26 U.S.C.A. § 162(a)(2). *See Hamburg v. Commissioner*, T.C. Memo. 1989–669, 1989 WL 154249 (U.S. Tax Ct.1989) ("[e]mployment is indefinite if its termination cannot be foreseen within a fixed or reasonably short period of time."). Furthermore, "employment which merely lacks permanence is indefinite unless termination is foreseeable within a short period of time." *Id.*

Torres would have left Carrabassett at any particular time had he not been injured.

It is thus clear that Torres was furnished to meet an "indefinite," not a "short-term," workload condition, and therefore he was not a "temporary worker" within the meaning of the policy. Because Torres was a "leased worker" at the time of his injuries, he was an "employee" under the terms of the policy and the employee exclusion applies to his claims. Accordingly, there is no coverage for Torres's lawsuit against Carrabassett under the policy.[8] Summary judgment in favor of plaintiffs is therefore appropriate.

### III. *Conclusion*

For the reasons set forth above, plaintiffs' motion for summary judgment is GRANTED. A declaratory judgment will issue consistent with the findings set forth in this Memorandum and Order.

**So Ordered.**

---

8. The fact that Torres can still pursue a tort claim against Carrabassett does not influence the scope of the CGL policy's coverage. *See Home Ins. Co.,* 444 Mass. at 603, 830 N.E.2d 186 (noting that a leasing firm's client is not immune from tort claims according to the workers' compensation act).